**CO–RECT PRODUCTS, INC., Appellee,**

v.

**MARVY! ADVERTISING PHOTOGRA-PHY, INC., Brian W. Stewart, Sabes & Richman, Inc., Michael G. Sabes, and Steven I. Richman, Appellants.**

**CO–RECT PRODUCTS, INC., Appellant,**

v.

**MARVY! ADVERTISING PHOTOGRA-PHY, INC., Brian W. Stewart, Sabes & Richman, Inc., Michael G. Sabes, and Steven I. Richman, Appellees.**

Nos. 85–5074, 85–5083.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 11, 1985.

Decided Dec. 20, 1985.

Rehearing Denied Jan. 22, 1986.

Richard O. Bartz, Minneapolis, Minn., for appellants.

Herman H. Bains, Minneapolis, Minn., for appellee.

Before LAY, Chief Judge, FLOYD R. GIBSON, Senior Circuit Judge and BOWMAN, Circuit Judge.

FLOYD R. GIBSON, Senior Circuit Judge.

Marvy! Advertising Photography, Inc., Brian Stewart, Michael Sabes, Steven Richman, and Sabes & Richman, Inc. (S & R) brought this action against Co-Rect Products, Inc. alleging copyright infringement, antitrust violations, and unfair competition

with respect to an advertising brochure prepared by Marvy and Stewart for S & R, and duplicated by Co-Rect. Co-Rect filed a counterclaim against S & R for unfair competition. The district court[1] entered judgment in favor of Co-Rect on the copyright and antitrust claims, and in favor of S & R on its unfair competition claim and on Co-Rect's counterclaim. Co-Rect appeals and S & R cross appeals. For the reasons discussed below, we reverse the court's judgment in favor of S & R on the unfair competition claim, but affirm the judgment in all other respects.

## I. FACTS

The district court's findings disclose that Co-Rect has manufactured bar supplies since 1970, and sells its products directly and through distributors to the restaurant and tavern trade. One of its products is the Co-Rect Control Pourer, which dispenses a measured volume of liquor from a bottle into a glass. The pourer eliminates the use of a conventional shot glass and allows the bartender to pour a mechanically measured volume of liquor directly into the customer's glass, thereby controlling waste and over-pouring. In 1978, S & R became a distributor of the Co-Rect Control Pourer. There was no written agreement and no restrictions placed on either S & R or Co-Rect with respect to geographical markets or the type of customers to whom each could sell the control pourers. Consequently, Co-Rect and S & R immediately became competitors in that they both sold the pourers in the same market.

Co-Rect supplied its distributors, including S & R, with a brochure depicting the control pourer and setting forth special instructions on its use. These brochures were mailed by the distributors to their customers, the names of which were supplied by Co-Rect. S & R became dissatisfied with Co-Rect's brochure and requested the services of Stewart and Marvy to create and produce a new one. The new brochure was multi-colored and pictured a bartender standing behind a bar looking at a control pourer inserted in the top of a liquor bottle that he was holding in his hand. The headline expression read, "With the Cheapshot he can save you enough money to pay his own salary." Below this headline, a close-up of the control pourer appeared with a brief description of its characteristics. The back of the brochure consisted of additional pictures and copy describing the advantages of using the product. The Co-Rect Control Pourer was depicted throughout the brochure, but it was referred to as the "Cheapshot," a name created by Stewart specifically for S & R's brochure.

Despite warnings by Marvy and Stewart that a copyright notice should be placed on the new brochure, in April of 1979 S & R authorized the printing and distribution of 25,000 copies without such a notice. Later in 1979, 50,000 additional copies were printed and distributed, none of which contained a copyright notice.

Co-Rect's president received a copy of S & R's brochure and gave it to his printer with the instruction to make "something like this or better." Co-Rect's president selected the photographs and the copy that were to appear on its new brochure. The end result was a brochure that was identical to S & R's brochure with respect to the theme, format, and most of the photographs. Where S & R had used the word "Cheapshot," Co-Rect used the words "Co-Rect Control Pourer," even in the headline expression, which read, "With the Co-Rect Control Pourer he can save you enough money to pay his own salary." Co-Rect authorized the printing of 100,000 copies of this brochure in February of 1980 and an additional 50,000 during the following September. Co-Rect used the brochure in magazine advertisements and distributed it to customers from March of 1980 until March of 1981, when it was phased out in favor of a new brochure.

---

1. The case was tried to the court, the Honorable Robert G. Renner, United States District Judge, District of Minnesota presiding.

In April of 1980, S & R began ordering control pourers exclusively from another supplier, Magnuson Industries. In June, S & R authorized the printing and distribution of an additional 10,000 copies of its brochure, affixing a copyright notice for the first time. Marvy and Stewart filed for and obtained copyright registration on S & R's brochure in February of 1981. The following August, Marvy, Stewart, Sabes, Richman, and S & R brought this action against Co-Rect for copyright infringement, antitrust violations, and unfair competition. Co-Rect filed a counterclaim alleging unfair competition by S & R for the unauthorized use of photographs of the Co-Rect Control Pourer in S & R's brochure. It was not until June of 1983 that Marvy and Stewart assigned to S & R an interest in their copyright registration of the S & R brochure.

The district court found that Marvy, Stewart, and S & R knowingly omitted the copyright notice on the first 75,000 copies of S & R's brochure, and that affixing such a notice to the last 10,000 copies was merely an attempt to comply with the prerequisites of a copyright infringement action.[2] The court concluded that the plaintiffs had failed to comply with the copyright laws and that such failure was not excused pursuant to 17 U.S.C. § 405(a)(2) (1982). The court, therefore, dismissed the copyright infringement claim.[3] The court also found that Co-Rect did not interfere with S & R's customers and that the evidence did not establish that Co-Rect intended to or did in fact control prices or destroy competition. The court therefore concluded that S & R had failed to establish any antitrust violations.[4] The court found, however, that Co-Rect deliberately duplicated S & R's brochure, and that the brochure's headline expression, "With the Cheapshot he can save you enough money to pay his own salary," had acquired a secondary meaning, designating S & R as the origin of the pourer depicted in the brochure. The court concluded that S & R owned common law trademark rights in the expression, and that Co-Rect's duplication of the brochure constituted a false designation of origin in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1982). The court determined that S & R was entitled to damages in an amount equal to the costs it incurred in creating and producing the original brochure and in printing the first 75,000 copies. The court trebled that amount pursuant to 15 U.S.C. § 1117. Finally, with respect to Co-Rect's counterclaim, the court found that Co-Rect had implicitly consented to the use of photographs of the Co-Rect Control Pourer in S & R's brochure. The court concluded, therefore, that S & R had not violated section 43(a) of the Lanham Act.

On appeal, Co-Rect contends that the only evidence to support the court's finding that the headline expression had acquired a secondary meaning[5] is the testimony of. S & R's Michael Richman that some of its customers were confused after

2. A notice of copyright must be placed on all publicly distributed copies of the work sought to be protected. 17 U.S.C. § 401(a) (1982). Omission may be cured if any one of three conditions set forth in 17 U.S.C. § 405(a) is met. Section 405(a)(2) provides that the omission does not invalidate the copyright if registration "has been made before or is made within five years after the publication without notice, and a reasonable effort is made to add notice * * * after the omission has been discovered." 17 U.S.C. § 405(a)(2) (1982). The court found that the plaintiffs failed to make a reasonable effort to add the notice.

3. Co-Rect had also filed a third-party complaint against its printer, Anderberg-Lund Printing Company, alleging that Co-Rect had relied on Anderberg's assurances that the brochure it produced for Co-Rect would not violate "anyone's intellectual property rights." Because the court found no copyright infringement by Co-Rect, it also dismissed the third-party complaint.

4. On appeal, the parties do not take issue with the court's findings and conclusions with respect to the copyright and antitrust claims. Consequently, we do not address those portions of the court's judgment.

5. Although the court listed as a conclusion of law its determination that the expression had acquired a secondary meaning, such a determination is considered a finding of fact, and we will treat it accordingly. *See Shoppers Fair v. Sanders Co.,* 328 F.2d 496, 499 (8th Cir.1964).

Co-Rect distributed its new brochure, that 85,000 brochures were distributed, and that S & R used the expression as a mark for approximately one year. Co-Rect argues that this evidence is insufficient to establish secondary meaning. With respect to the court's finding that Co-Rect consented to the use of photographs of its pourer, Co-Rect contends that because its relationship with S & R had changed, it could not have given S & R its consent. Co-Rect contends that S & R used those photographs to sell Magnuson Control Pourers, which Co-Rect argues is a clear violation of section 43(a). S & R cross appeals, contending that the court erred in calculating the damage award because it failed to award S & R its attorney fees and Co-Rect's profits.

## II. APPLICABLE LAW

■ The term "trademark" is defined as "any word, name, symbol, or device or any combination thereof adopted and used by a manufacturer or merchant to identify and distinguish his goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." 15 U.S.C.A. § 1127 (West Supp.1985). Only distinctive marks are entitled to protection. In determining whether a mark is entitled to protection, courts have employed several approaches, including the categorization of the mark as either generic, descriptive, suggestive, or arbitrary. *See Anheuser-Busch Inc. v. Stroh Brewery Co.*, 750 F.2d 631, 634 (8th Cir.1984); *WSM, Inc. v. Hilton*, 724 F.2d 1320, 1325 (8th Cir.1984); *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9–11 (2d Cir.1976).

■ A generic mark is one that refers to the common name or the nature of an article, and most courts hold that it is not entitled to trademark protection. *See*

*Thompson Medical Co. v. Pfizer Inc.*, 753 F.2d 208, 213 (2d Cir.1985); *Abercrombie & Fitch Co.*, 537 F.2d at 9. A descriptive mark designates the characteristics, qualities, effects, or other features of the product, and is protectable only if shown to have become distinctive, that is, shown to have acquired a secondary meaning. *Thompson Medical Co.*, 753 F.2d at 213–14; *Miller Brewing Co. v. G. Heilman Brewing Co.*, 561 F.2d 75, 79 (7th Cir.1977), *cert. denied*, 434 U.S. 1025, 98 S.Ct. 751, 54 L.Ed.2d 772 (1978); *Abercrombie & Fitch Co.*, 537 F.2d at 10. Suggestive marks, which require imagination to reach a conclusion as to the nature of the goods, and arbitrary or fanciful marks, which are inherently distinctive, are entitled to immediate protection, without establishing secondary meaning. *Miller Brewing Co.*, 561 F.2d at 79; *Abercrombie & Fitch Co.*, 537 F.2d at 11.

■ When a manufacturer or a merchant seeks to protect a registered mark, he may do so pursuant to section 32(1) of the Lanham Act, 15 U.S.C. § 1114.[6] Registration, however, is not a prerequisite for protection, and therefore recovery, under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). *Thompson Medical Co.*, 753 F.2d at 212. Section 43(a) is said to create a new federal remedy for a particular kind of unfair competition that results from false designations or other false representations. *Metric & Multistandard Components v. Metric's Inc.*, 635 F.2d 710, 713 (8th Cir.1980); *American Footwear Corp. v. General Footwear Co.*, 609 F.2d 655, 664 (2d Cir.1979), *cert. denied*, 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980). Section 43(a) contains two prohibitions with respect to goods or services, a prohibition of false designations of origin and a prohibition of false descriptions or representations.[7] An owner of a mark is entitled to

---

6. Infringement occurs when another's use of the same or similar mark is "likely to cause confusion, or to cause mistake, or deceive." *Squirtco v. Seven-Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1980) (quoting 15 U.S.C. §§ 1114(1), 1127).

7. Section 43(a) provides that:

Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, * * * shall be liable to

injunctive relief if the use of that mark violates either prohibition and causes a likelihood of confusion among consumers. *WSM, Inc.,* 724 F.2d at 1331. If, on the other hand, the use of that mark by another violates either prohibition and causes actual confusion, the owner is entitled to damages. *Warner Brothers v. Gay Toys, Inc.,* 658 F.2d 76, 79 (2d Cir.1981) (*Warner I*).

■ To succeed on a claim of false designation of origin with respect to an unregistered descriptive mark, before a likelihood of confusion or actual confusion is established, the user must show that the mark has acquired a secondary meaning. *Thompson Medical Co.,* 753 F.2d at 212–13 and n. 9; *Warner Brothers v. Gay Toys, Inc.,* 724 F.2d 327, 330 (2d Cir.1983) (*Warner II*). " 'Secondary meaning converts a word originally incapable of serving as a mark into a full fledged trademark.' " *University of Georgia Athletic Association v. Laite,* 756 F.2d 1535, 1540 (11th Cir.1985) (quoting 3 R. Callmann, The Law of Unfair Competition, Trademarks and Monopolies § 19.25 (4th ed. 1983)). The user must also show that secondary meaning existed prior to the date on which the defendant commenced using the same or similar mark. *Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225, 1231 (3d Cir.1978).

■ To establish secondary meaning, the user must show that the mark or symbol " 'by long and exclusive use and advertising * * * in the sale of [the user's] goods * * * [has] become so associated in the public mind with such goods * * * that it serves to identify them and distinguish them from the goods * * * of others.' " *Truck Equipment Service Co. v. Fruehauf Corp.,* 536 F.2d 1210, 1219 (8th Cir.) (quoting *Shoppers Fair v. Sanders Co.,* 328 F.2d 496, 499 (8th Cir.1964)), *cert. denied,* 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976). Secondary meaning is an association formed in the minds of the consumers between the mark and the source or origin of the product. *See Truck Equipment Service Co.,* 536 F.2d at 1219–20. Although the test as to whether secondary meaning has been established is apparently not uniform among the circuits, the ultimate inquiry is whether in the consumer's mind the mark denotes a "single thing coming from a single source." *Security Center, Ltd. v. First National Security Centers,* 750 F.2d 1295, 1301 (5th Cir.1985) (quoting *Aloe Creme Laboratories, Inc. v. Milsan, Inc.,* 423 F.2d 845, 849 (5th Cir.), *cert. denied,* 398 U.S. 928, 90 S.Ct. 1818, 26 L.Ed.2d 90 (1970)). *See Inwood Laboratories v. Ives Laboratories,* 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 2187 n. 11, 72 L.Ed.2d 606 (1982) (primary significance of mark is to identify the source of a product).

■ Once secondary meaning is established, the mark is entitled to trademark protection. A false designation of origin occurs when another's use of the same or similar mark actually confuses, or is likely to cause confusion among consumers as to the source of the product. *Thompson Medical Co.,* 753 F.2d at 212–13; *WSM, Inc.,* 724 F.2d at 1331. A showing of actual confusion entitles the owner of the mark to damages, while a showing of a likelihood of confusion entitles the owner to injunctive relief. *Warner I,* 658 F.2d at 79. In determining whether a likelihood of confusion exists, the court must consider the following factors: (1) the strength of the owner's mark; (2) the similarity between the owner's mark and the alleged infringer's mark; (3) the degree to which the products compete with each other; (4) the alleged infringer's intent to "pass off" its goods as those of the trademark owner; (5) incidents of actual confusion; and (6) the type of product, its costs and conditions of purchase. *Squirtco v. Seven-Up Co.,* 628 F.2d 1086, 1091 (8th Cir.1980).

The prohibition of false descriptions or representations may be violated in several ways, including when a merchant or manu-

---

* * * any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

15 U.S.C. § 1125(a) (1982).

facturer uses the photograph of a competitor's product to advertise his own goods. *L'Aiglon Apparel Inc. v. Lana Lobell, Inc.*, 214 F.2d 649, 650 (3d Cir.1954). The law in this area, however, is unclear. Several decisions involving this prohibition discuss it in terms of a false designation or representation of origin. *Truck Equipment Service Co.*, 536 F.2d at 1216–21; *L & L White Metal Casting Corp. v. Joseph*, 387 F.Supp. 1349, 1356 (E.D.N.Y.1975); *General Pool Corp. v. Hallmark Pool Corp.*, 259 F.Supp. 383, 385–86 (N.D.Ill. 1966). *See also Davis v. United Artists, Inc.*, 547 F.Supp. 722, 727–28 (S.D.N.Y. 1982) (title of work protected from false representations if it has acquired a secondary meaning and a likelihood of confusion exists). Other decisions emphasize the inferiority of the product actually offered for sale. *Vibrant Sales, Inc. v. New Body Boutique, Inc.*, 652 F.2d 299, 305 (2d Cir. 1981); *Pantone, Inc. v. A.I. Friedman, Inc.*, 294 F.Supp. 545, 552 (S.D.N.Y.1968); *George O'Day Associates, Inc. v. Talman Corp.*, 206 F.Supp. 297, 300 (D.R.I.), *aff'd*, 310 F.2d 623 (1st Cir.1962), *cert. denied*, 372 U.S. 977, 83 S.Ct. 1112, 10 L.Ed.2d 142 (1963).

■ Finally, the appropriate provision for determining the monetary relief to be awarded under section 43(a) is section 35 of the Lanham Act, 15 U.S.C. § 1117 (West Supp.1985). *Metric & Multistandard Components*, 635 F.2d at 715. Section 35 provides that the successful plaintiff is entitled "to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C.A. § 1117(a). With respect to the defendant's profits, the plaintiff is only required to prove the defendant's sales; any deductions or costs must be shown by the defendant. *Id.* The court may award rea-

sonable attorneys fees to the prevailing party in exceptional cases. *Id.*

Co-Rect contends that the district court erred in finding that the expression, "With the Cheapshot he can save you enough money to pay his own salary," had acquired a secondary meaning. Co-Rect also contends that the court erred in finding that S & R had not made false representations in its advertising brochure. Our review of these factual findings is subject to the clearly erroneous standard. *See* F.R. C.P. 52; *Inwood Laboratories*, 456 U.S. at 855, 102 S.Ct. at 2189. In its cross appeal, S & R contends that the court erred in calculating the damage award.

## III. DISCUSSION

■ We begin our discussion by determining whether the alleged mark is entitled to trademark protection. Certainly, the expression can be considered a "combination" of "word[s]" used by S & R in an attempt to "identify and distinguish" its goods from those manufactured by others, as those words are used in the statutory definition of a trademark. The threshold issue, however, is whether the expression is generic, descriptive, suggestive, or arbitrary. The district court made no determination on this issue. The court found, however, that the expression had acquired a secondary meaning. Implicit in this finding is the determination that the expression is descriptive; for if the mark were generic, it may be said that secondary meaning could not transform it into a subject for trademark protection. *Abercrombie & Fitch Co.*, 537 F.2d at 9.[8] If the mark were suggestive or arbitrary, proof of secondary meaning would have been unnecessary because of the mark's inherent distinctiveness. *See id.* at 10. Therefore, the court must have determined that the expression is descriptive. We agree. A descriptive

---

**8.** *But see Metric & Multistandard Components v. Metric's, Inc.*, 635 F.2d 710 (8th Cir.1980). A generic mark may be entitled to protection if it is "so associated with its goods that the use of the same or similar marks by another company constitutes a representation that its goods came from the same source." *Id.* at 714. Even if S

& R's headline expression were generic, it would not be entitled to protection because the evidence does not support a finding that it has become associated with the pourer to the degree contemplated in *Metric & Multistandards Components*.

mark designates the characteristics, qualities, or other features of the product. The expression clearly designates the money-saving quality of the control pourer. Before it can be said that S & R is entitled to protection of this unregistered descriptive mark, however, S & R must establish that it has become distinctive, that is, that the mark has acquired a secondary meaning. Once secondary meaning is established, S & R must show at least a likelihood of confusion in order to succeed on a claim of false designation of origin in violation of section 43(a).

## A. False Designation of Origin

The district court did not set forth the evidence on which it relied in determining that S & R had satisfied its burden of showing that the expression had acquired a secondary meaning. After reviewing the record, we are convinced that the evidence does not support such a determination.

To sustain its burden, S & R was required to show that the expression, "through long and exclusive use and advertising" had "become so associated in the public mind" with its control pourer that the expression served to "identify and distinguish" the pourer from those manufactured by others. *See Truck Equipment Service Co.*, 536 F.2d at 1219. S & R also had the burden of showing that the expression acquired a secondary meaning before Co-Rect began using the same or similar expression. S & R began using the expression in April of 1979, ten months before Co-Rect began using a similar mark in February of 1980. Although no specific rule exists with respect to how long a mark must be used, we feel that in these circumstances ten months is simply not sufficient time to establish secondary meaning in the market place. *See Security Center, Ltd.*, 750 F.2d at 1301 (two years of exclusive use insufficient time to acquire secondary meaning); *Bank of Texas v. Commerce Southwest, Inc.*, 741 F.2d 785, 788 (5th Cir.1984) (although court recognized secondary meaning *could* be established in

"three short years," it held nine years was insufficient); *Metrics & Multistandard Components*, 635 F.2d at 711–14 (secondary meaning found where plaintiff used nonfunctional portions of its catalogues for approximately ten years before defendant copied them). *See also Shoppers Fair*, 328 F.2d at 499 (no secondary meaning in nine months).

■■■■ We recognize that the length of time that a mark is used is only one factor to be considered. S & R emphasizes three additional factors: (1) its advertising effort; (2) the intentional copying by Co-Rect; and (3) the uncontradicted testimony of Mr. Stewart, the creator of the expression. Although it is true that advertising is a relevant factor in determining whether a mark has acquired a secondary meaning, it is the *effect* of such advertising that is important, not its extent. *Security Center, Ltd.*, 750 F.2d at 1301. To be effective in this respect, the advertising must cause the public to equate the mark with the source of the product. The evidence simply does not show, and it cannot be inferred, that the distribution of 75,000 brochures during a ten-month period caused the purchasing public to equate the brochure's headline expression with the source of the control pourer. It is also true that intentional copying of a mark is a relevant factor to be considered. Intentional copying, however, is not conclusive, *Brooks Shoe Manufacturing v. Suave Shoe Corp.*, 716 F.2d 854, 860 (2d Cir.1983), and in this case it does not overcome the short length of time the mark was used and the lack of evidence with respect to the effectiveness of the advertising. Finally, the uncontradicted testimony of Mr. Stewart that he intended to create an expression that would "be associated with the product" is unimportant. The desires or intentions of the creator, or even the owner, of a mark are irrelevant. Instead, it is the attitude of the consumer that is important. As we stated above, the chief inquiry is whether in the consumer's mind the mark has become as-

sociated with a particular source. The evidence fails to establish this association.[9]

The only evidence in this case from which an inference of such an association might have been drawn is the evidence of confusion. The court found that Mr. Pierce of Co-Rect and Mr. Richman of S & R both testified that their respective customers were confused as to which product each company sold after Co-Rect distributed its brochure. Although in previous cases we have considered unequivocal testimony of both parties with respect to consumer association, *see, e.g., Truck Equipment Service Co.*, 536 F.2d at 1220, no such unequivocal testimony exists in this case. We have reviewed Mr. Pierce's testimony and have found no reference to confusion by his customers. More is needed to establish the necessary consumer association than merely the self-serving testimony of the plaintiff that some of his customers were confused. The court's finding with respect to secondary meaning is clearly erroneous.

In sum, we are left with a definite and firm conviction that the district court made a mistake in finding that the expression on S & R's brochure had acquired a secondary meaning. Because no secondary meaning exists, we do not need to determine whether there is a likelihood of confusion. Without secondary meaning, the expression is not entitled to protection, and there can be no false designation of origin.

### B. False Representation

■ Co-Rect also contends that the court erred in finding that S & R did not violate section 43(a). Co-Rect argues that S & R's use of photographs of the Co-Rect Control Pourer in the last 10,000 brochures constituted a false representation because S & R was actually selling Magnuson pourers. The court found that S & R published the last 10,000 brochures solely to comply with the copyright laws. The court also found that Co-Rect consented to the use of the photographs, and therefore there was no violation. On appeal, Co-Rect argues that because its relationship with S & R had changed, it could not have consented.

While there may be some merit in Co-Rect's argument that it did not consent, the district court's finding is not clearly erroneous. We have recognized that section 43(a) " 'should be construed to include only such false descriptions or representations as are of substantially the same economic nature as those which involve infringement or other improper use of trademarks.' " *Truck Equipment Service Co.*, 536 F.2d at 1216 (quoting *Bernard Food Industries, Inc. v. Dietene Co.*, 415 F.2d 1279, 1283 (7th Cir. 1969), *cert. denied*, 397 U.S. 912, 90 S.Ct. 911, 25 L.Ed.2d 92 (1970)). The court emphasized that the deceptive practices by the defendant in that case were of the same economic nature as trademark infringement. The defendant had used a photograph of the plaintiff's product to trade upon the reputation of the plaintiff and to cause confusion among customers. *Id.* Clearly, S & R was not attempting to trade upon Co-Rect's reputation or cause confusion when it published the last 10,000 brochures. S & R's publication of those brochures was merely a belated attempt to

---

**9.** Consumer surveys are recognized by several circuits as the most direct and persuasive evidence of secondary meaning. *See Thompson Medical Co.*, 753 F.2d at 217 (consumer studies linking name to source); *Security Center, Ltd.*, 750 F.2d at 1301 (lack of survey evidence considered an "insurmountable hinderance" to establishing secondary meaning in that case); *Gimix, Inc. v. JS & A Group, Inc.*, 699 F.2d 901, 907 (7th Cir.1983) (consumer surveys and testimonies are the only direct evidence on this issue); *Surgicenters of America v. Medical Dental Surgeries*, 601 F.2d 1011, 1018 and n. 23 (9th

Cir.1979) (recognizing the importance of such evidence, and acknowledging the lack of it in the appellant's unsuccessful attempt to establish secondary meaning). *See generally Anheuser-Busch Inc.*, 750 F.2d at 639 (in trademark and unfair competition cases, substantial weight should be given to properly conducted surveys when determining the viewpoint of the purchasing public). We agree that this type of evidence should be considered as an additional factor in determining whether a mark has acquired secondary meaning. No such evidence exists in this case.

comply with the copyright laws. We do not feel that S & R's conduct was of the same economic nature as trademark infringement. The court properly concluded that S & R did not violate the false representation prohibition of section 43(a).[10]

## C. Damages

On cross appeal, S & R contends that the court erred in calculating damages. S & R argues that it should have been awarded attorneys fees and Co-Rect's profits. The damage award was based upon the false designation of origin claim. Because we find that there was no false designation of origin, S & R is not entitled to damages. Therefore, we do not address the arguments on cross appeal.

## IV. CONCLUSION

In conclusion, we hold that the district court's finding with respect to secondary meaning is clearly erroneous. Therefore, we reverse that portion of the court's judgment concluding that Co-Rect's conduct constituted a false designation of origin in violation of section 43(a). Consequently, S & R is not entitled to damages. We affirm, however, the court's judgment in all other respects. The costs of this appeal are to be assessed against S & R.

Reversed in part, affirmed in part.

---

10. We recognize that several decisions involving false representations focus on a false representation of origin, while others focus on the inferiority of the defendant's product. Because we conclude that S & R's use of the photographs in these circumstances is not the type of conduct prohibited by section 43(a), we do not reach the issues of origin or inferiority.