# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 04-2502

———————

|  |  |  |
|---|---|---|
| Frosty Treats, Inc.; Frosty Treats of Louisville, Inc.; Frosty Treats Wholesale, Inc.; Frosty Treats of Atlanta, Inc., | * * * * * | |
| Appellants, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Western District of Missouri. |
| Sony Computer Entertainment America, Inc. | * * | |
| | * | |
| Appellee. | * | |

———————

Submitted: March 16, 2005
Filed: July 25, 2005

———————

Before MORRIS SHEPPARD ARNOLD, BOWMAN, and RILEY, Circuit Judges.

———————

MORRIS SHEPPARD ARNOLD, Circuit Judge.

A group of affiliated companies, Frosty Treats, Inc., Frosty Treats of Louisville, Inc., Frosty Treats Wholesale, Inc., and Frosty Treats of Atlanta, Inc., collectively known as "Frosty Treats," sued Sony Computer Entertainment America, Inc., (SCEA) asserting, *inter alia*, claims under state and federal law for trademark infringement and dilution, and for unfair competition. Frosty Treats premised these claims upon SCEA's depiction of an ice cream truck and clown character in SCEA's

Twisted Metal video game series. Frosty Treats contends that because the ice cream truck in those games bears a clown graphic that it alleges is similar to the one on its ice cream trucks, and, in the final game, is labeled with its brand identifier, "Frosty Treats," the games create a likelihood of confusion as to Frosty Treats's sponsorship of or affiliation with the games. *See* 15 U.S.C. § 1125(a). The district court[1] granted SCEA's motion for summary judgment on all of Frosty Treats's claims, and Frosty Treats appeals. We affirm.

Frosty Treats asserts that the district court erred by finding that there were no genuine issues of material fact and holding as a matter of law that the "Frosty Treats" mark was not protectible; that the "Safety Clown" graphic was functional and therefore not entitled to trademark protection; that there was no likelihood of confusion between any of the Twisted Metal games and the "Frosty Treats" mark, Safety Clown mark, or the trade dress of Frosty Treats's vehicles; and that Frosty Treats failed to make out actionable trademark dilution claims under both federal and Missouri law.

We review a grant of summary judgment *de novo*, applying the same standards as the district court. *Insty\*Bit, Inc. v. Poly-Tech Indus., Inc.*, 95 F.3d 663, 666 (8th Cir. 1996), *cert. denied*, 519 U.S. 1151 (1997). We will affirm when the record, viewed in the light most favorable to the non-moving party, demonstrates that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *Id.* Upon motion and after adequate discovery, summary judgment should be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Because none of the marks at issue has been federally

___

[1]The Honorable Scott O. Wright, United States District Judge for the Western District of Missouri.

registered by Frosty Treats, it bears the burden of establishing that its marks are protectible under trademark law. *See Anheuser-Busch, Inc. v. Stroh Brewery Co.*, 750 F.2d 631, 638 (8th Cir. 1984); *Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns, Inc.*, 198 F.3d 1143, 1146 (9th Cir. 1999). We "may uphold a grant of summary judgment for any reason supported by the record, even if different from the reasons given by the district court." *Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535 (8th Cir. 1999).

## I.

Frosty Treats argues first that the district court erred by holding that its "Frosty Treats" mark is not entitled to trademark protection because it is generic, or, in the alternative, descriptive without secondary meaning. Frosty Treats asserts that the mark is suggestive, or, at worst, descriptive with an acquired secondary meaning, and therefore protectible. We disagree. At best, the "Frosty Treats" mark is descriptive, and there is no basis for concluding that it has acquired secondary meaning.

The stylized words "Frosty Treats" appear toward the rear of the passenger's side of plaintiffs' ice cream vans as pink capital letters with frost on the upper portion of each letter. *See* Figure 1 (depicting the "Frosty Treats" decal). The decal on which these words appear is approximately nine inches wide by four inches high and is surrounded by decals of the frozen products that the Frosty Treats vans sell. *See* Figure 2 (depicting a typical Frosty Treats van).



Figure 1.



Figure 2.

To determine whether this mark is protectible, we must first categorize it. "A term for which trademark protection is claimed will fall in one of four categories: (1) generic, (2) descriptive, (3) suggestive, or (4) arbitrary or fanciful." *WSM, Inc. v. Hilton*, 724 F.2d 1320, 1325 (8th Cir. 1984). A generic mark refers to the common name or nature of an article, and is therefore not entitled to trademark protection. *Co-Rect Prods., Inc. v. Marvy! Adver. Photography, Inc.*, 780 F.2d 1324, 1329 (8th Cir. 1985). A term is descriptive if it conveys an "immediate idea of the ingredients, qualities or characteristics of the goods," *Stuart Hall Co., Inc. v. Ampad Corp.*, 51 F.3d 780, 785-86 (8th Cir. 1995) (internal quotations omitted), and is protectible only if shown to have acquired a secondary meaning. *Co-Rect Prods.*, 780 F.2d at 1329. Suggestive marks, which require imagination, thought, and perception to reach a conclusion as to the nature of the goods, and arbitrary or fanciful marks, are entitled to protection regardless of whether they have acquired secondary meaning. *See id.*

If it is not generic, the phrase "Frosty Treats" is, at best, descriptive. Frosty Treats is in the business of selling frozen desserts out of ice cream trucks. "Frosty

Treats" conveys an immediate idea of the qualities and characteristics of the goods that it sells. No imagination, thought, or perception is required to reach a conclusion as to the nature of its goods. To prevail, therefore, Frosty Treats must demonstrate that the mark has acquired a secondary meaning. "Secondary meaning is an association formed in the minds of consumers between the mark and the source or origin of the product." *Id.* at 1330. To establish secondary meaning, Frosty Treats must show that "Frosty Treats" serves to identify its goods and distinguish them from those of others. *Id.* Secondary meaning does not require the consumer to identify a source by name but does require that the public recognize the mark and associate it with a single source. *Stuart Hall*, 51 F.3d at 789; *see Heartland Bank v. Heartland Home Fin., Inc.*, 335 F.3d 810, 818-19 (8th Cir. 2003) (Smith, J., concurring).

The record, when viewed in favor of Frosty Treats, demonstrates that SCEA is entitled to judgment as a matter of law on this issue. Frosty Treats has failed to put forth more than a scintilla of evidence that the public recognizes its "Frosty Treats" mark and associates it with a single source. Frosty Treats claims that its survey evidence demonstrates that the term "Frosty Treats" has acquired secondary meaning, but, if anything, it indicates the opposite. In the survey, respondents were shown images of the Frosty Treats ice cream van and asked, "Are you familiar with or have you ever seen or heard of this before?" Forty-seven percent responded affirmatively. They were then asked what they knew about the van. The respondents most frequently mentioned that it sold ice cream. Only one percent of the respondents in the survey mentioned Frosty Treats by name. There is no indication in the record that the survey respondents (apart from the one percent) were familiar with the vans because of the small nine-by-four-inch "Frosty Treats" decal on the rear portion of the side of the van, the only place where the phrase "Frosty Treats" appears on the vehicle. This decal, moreover, is surrounded by numerous other decals comprising the van's menu board. *See* Figure 2. Frosty Treats's survey provides no basis to conclude that the respondents associated the van with a single source as opposed to simply a generic ice cream truck.

Although direct evidence such as consumer testimony or surveys are most probative of secondary meaning, it can also be proven by circumstantial evidence. *See Heartland Bank*, 335 F.3d at 819-20 (Smith, J., concurring). Circumstantial evidence such as the exclusivity, length and manner of use of the mark; the amount and manner of advertising; the amount of sales and number of customers; the plaintiff's established place in the market; and the existence of intentional copying could also establish secondary meaning. *See id.* (citing 2 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* §§ 15:30, 15:60, 15:61, 15.66, 15.70 (4th ed. 1999)). But the circumstantial evidence that Frosty Treats offered to establish secondary meaning also fails to raise a genuine issue of material fact.

We recognize that the application of some of these criteria to the facts of this case may militate in favor of a finding of secondary meaning in the mind of a reasonable juror. For instance, there is evidence that Frosty Treats has used the term in a continuous and substantially exclusive manner since 1991. *Cf. Stuart Hall*, 51 F.3d at 789-90. Furthermore, the record reflects that Frosty Treats, although a relatively small company, is nevertheless one of the largest ice cream truck street vendors in the nation.

On the other hand, there is no evidence that SCEA intentionally copied the term. Most significantly, the record does not contain sufficient evidence for a juror to conclude that Frosty Treats engages in advertising or publication of the "Frosty Treats" mark to an extent that would be effective in having the public recognize it and equate it with a single source. *See Co-Rect Prods*., 780 F.2d at 1330; *Heartland Bank*, 335 F.3d at 820 (Smith, J., concurring). In fact, Frosty Treats does not even prominently display the "Frosty Treats" mark on its street-vending vans, which according to its brief is the primary way that it advertises the phrase. As mentioned earlier, the phrase appears on the vans as a nine-by-four-inch decal that is surrounded by numerous other decals of frozen desserts.

Furthermore, SCEA submitted indirect evidence that the term "Frosty Treats" has not acquired secondary meaning. SCEA's expert conducted a survey of 204 children and 200 adults who had purchased ice cream from an ice cream truck in Frosty Treats's largest markets. When asked to volunteer the names of any ice cream trucks that they had purchased ice cream from, not one recalled the name "Frosty Treats." The evidence as a whole simply does not provide a sufficient basis for concluding that the phrase "Frosty Treats" has acquired a secondary meaning. Accordingly, it is not protectible under trademark law.

## II.

Frosty Treats also maintains that the district court erred in holding that its Safety Clown graphic is functional and therefore not eligible for protection under the trademark laws. The Safety Clown graphic appears on the passenger's side door of plaintiffs' vans as well as the rear panel. It consists of a clown with black eyebrows, blue eyes with a black pupil, a bulbous red nose, white forehead, yellow cheeks and chin, and a mouth with a black center, outlined by a series of concentric red, white, and orange lips. The clown wears a blue ruffled collar and a yellow pointed hat with red polka-dots that is topped with a red pom-pom. A tuft of orange hair appears under the hat on each side of the clown's head. The clown's hand points to the rear of the van with the thumb and index finger extended. Below the clown appear the words "watch for cars – cross at rear." *See* Figure 3 (depicting the Safety Clown graphic). The clown's purpose is to promote safety by directing children to cross at the rear of the vehicle.



Figure 3.

The district court held that because the clown serves a purpose, namely to enhance safety by directing children to cross at the rear, the graphic is functional and therefore not protectible. We respectfully disagree. We believe that the district court evaluated the issue using the colloquial meaning of "functional" rather than the specialized meaning that it has in trademark law. In trademark law, " 'a product feature is functional, and cannot serve as a trademark, if it is essential to the use or purpose of the article or if it affects the cost or quality of the article.' " *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 32 (2001) (quoting *Qualitex Co. v. Jacobson Prods. Co., Inc.*, 514 U.S. 159, 165 (1995)) (internal quotations omitted).

"The functionality doctrine serves as a buffer between patent law and trademark law by preventing a competitor from monopolizing a useful product feature in the guise of identifying itself as the source of the product." *Home Builders Ass'n of Greater St. Louis v. L & L Exhibition Mgmt., Inc.*, 226 F.3d 944, 948 (8th Cir. 2000). Furthermore, " 'to be functional in the trade dress sense, the feature must be necessary to afford a competitor the means to compete effectively.' " *Id.* (quoting *Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 297 (7th Cir. 1998), *cert. denied*, 525 U.S. 929 (1998)). There is no evidence that the exclusive use of the Safety Clown graphic would deny Frosty Treats's competitors the ability to compete effectively or place competitors at any non-reputational disadvantage. *See Gateway, Inc. v. Companion Prods., Inc.*, 384 F.3d 503, 508 (8th Cir. 2004). At the very least, whether the Safety Clown graphic is functional presents a factual issue not appropriate for resolution upon a motion for summary judgment. *See Insty*Bit*, 95 F.3d at 673-74. We therefore conclude that the district court erred in granting summary judgment on the ground that the clown was functional.

## III.

Apart from finding that the "Frosty Treats" and Safety Clown marks were unenforceable, the district court ruled that Frosty Treats in any event did not have

actionable trademark infringement or unfair competition claims based on those marks, or on the trade dress of its trucks, because it did not create a triable issue that SCEA's use of the marks and trade dress created a likelihood of confusion as to Frosty Treats's sponsorship of or affiliation with the video games. We now consider Frosty Treats's assertion that this was error. But since we have already held the "Frosty Treats" mark unenforceable as a matter of law, we need only address the arguments pertaining to the trade dress of the trucks and the Safety Clown mark.

We evaluate six criteria to determine whether a likelihood of confusion exists: "(1) the strength of the owner's mark; (2) the similarity between the owner's mark and the alleged infringer's mark; (3) the degree to which the products compete with each other; (4) the alleged infringer's intent to 'pass off' its goods as those of the trademark owner; (5) incidents of actual confusion; and (6) the type of product, its costs and conditions of purchase." *Co-Rect Prods.*, 780 F.2d at 1330. "These factors do not operate in a mathematically precise formula; rather, we use them at the summary judgment stage as a guide to determine whether a reasonable jury could find a likelihood of confusion." *Duluth News-Tribune v. Mesabi Publ'g Co.*, 84 F.3d 1093, 1096 (8th Cir. 1996). "Factual disputes regarding a single factor are insufficient to support the reversal of summary judgment unless they tilt the entire balance in favor of such a finding." *Id.*

To begin, we examine the strength of Frosty Treats's marks. In *SquirtCo. v. Seven-Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1980), we stated that, "A strong and distinctive trademark is entitled to greater protection than a weak or commonplace one." There can be little dispute that the Safety Clown mark and the trade dress of Frosty Treats's trucks are weak. The use of a clown on ice cream trucks is hardly novel: It is undisputed that other ice cream vendors utilize a clown design on their trucks. Similarly, the trade dress of Frosty Treats's vans resembles that of a generic ice cream truck and therefore lacks distinctiveness within the marketplace. There is,

moreover, no evidence to indicate that Frosty Treats's Safety Clown mark and trade dress are well known.

With respect to the second criterion, the Safety Clown mark and trade dress of Frosty Treats's vans are visually distinct from the relevant depictions in the Twisted Metal games and no reasonable juror could find that they are similar. Frosty Treats contends that because the ice cream truck in those games bears a clown graphic, and, in the final game, is labeled with its brand identifier, "Frosty Treats," a reasonable juror could find similarity. Of the six games in the Twisted Metal series, however, the words "frosty treats" appear only in the final game, Twisted Metal: Small Brawl. (Although plaintiffs nominally assert that this appeal covers all six games, they focus their arguments on the Small Brawl game.) The appearance of the words "frosty treats" in Small Brawl, moreover, is quite different from their appearance on Frosty Treats's vans. As mentioned earlier, the plaintiffs' vans display a nine-by-four-inch decal featuring the words "frosty treats" in pink capital letters with frost on the upper-portion of the letters. This decal is surrounded by decals picturing the different types of frozen deserts for sale. *See* Figure 2. In contrast, the phrase appears in Small Brawl on the side of a remote-controlled truck written in light aqua print in a mixture of upper and lower case letters ("FrOsTy TReAtS"), without frost and surrounded by pink polka-dots. *See* Figure 4 (depicting the remote-controlled vehicle in Small Brawl as it appeared in an advertisement for the game in Mad Magazine).



Figure 4.

Depictions of clown heads appear throughout the Twisted Metal video games and game manuals. The record reflects that a purple-nosed, black-eyed clown with a light aqua cap appears on the side of the remote-controlled truck in Small Brawl. Another clown head appears atop the antenna of the remote-controlled vehicle in Small Brawl. *See* Figure 4. These clowns bear virtually no resemblance to Safety Clown. All of the games in the Twisted Metal series feature a devious clown named Sweet Tooth or Needles Kane that drives or controls the ice cream truck. But those depictions are very different from the Safety Clown graphic. As Frosty Treats's CEO Carl Long stated at his deposition, "They don't look the same way, but ... if the Safety Clown had a brother who was nasty and mean, it would look somewhat like Sweet Tooth."

Regarding the third and fourth considerations for determining the likelihood of confusion, SCEA's products do not compete with Frosty Treats's and there is no evidence that SCEA intends to pass off Frosty Treats's marks as its own. Each Twisted Metal video game clearly indicates that it is produced by SCEA.

"[W]hen determining whether there exists a likelihood of confusion, weight is given to the number and extent of instances of actual confusion." *Life Tech., Inc. v. Gibbco Scientific, Inc.*, 826 F.2d 775, 777 (8th Cir. 1987). Frosty Treats contends that it provided significant evidence of actual confusion in the testimony of Roger Pool, its Louisville, Kentucky, branch manager, and the consumer survey conducted by its expert witness. We disagree. Mr. Pool testified that during a period of two years about five to ten people had inquired as to whether Frosty Treats sponsored the Twisted Metal games. But Mr. Pool cannot specifically recall what they said to him, the names of the individuals who questioned him, or the dates or locations of the inquiries. Even if this testimony is not inadmissible hearsay, *see Duluth News-Tribune*, 84 F.3d at 1098; *Vitek Sys., Inc. v. Abbott Labs.,* 675 F.2d 190, 193 (8th Cir. 1982), it amounts to no more than a scintilla of evidence. More is needed to establish

the likelihood of confusion than the ambiguous testimony of an interested person that there were several inquiries over a two-year period.

Frosty Treats's survey also fails to create a genuine issue of material fact regarding the likelihood of confusion. In the survey, participants who had played the Twisted Metal games were shown a picture of the Frosty Treats ice cream truck and told, "Please take a look at this. Feel free to comment on anything that strikes you about it, positively or negatively." Seventeen percent of the participants mentioned that it reminded them of or looked like images from the Twisted Metal games. As a follow-up question they were asked, "Specifically, does this or does this not remind you in any way of an ice cream truck or character that you have seen before or are aware of?" Thirty-four percent of those surveyed indicated that it reminded them of something from the Twisted Metal games. But these responses are not probative of confusion. A leading trademark treatise states, " 'Confusion' means more than that the junior user's mark merely 'calls to mind' the senior user's mark. ... While the junior user's mark may call to mind the senior user's famous mark, this alone is not sufficient for a likelihood of confusion." 3 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 23:9 at 23-34 to 23-35 (4th ed. 2005). The survey fails to address the relevant inquiry, which is whether consumers are confused as to the existence of any sponsorship of or affiliation or association with the Twisted Metal games by Frosty Treats.

The last criterion, which addresses the type of product, the price, and the conditions of purchase, is more important in confusion-of-source cases where the degree of care that the purchaser exercises in purchasing a product can eliminate the confusion that might otherwise exist. *See SquirtCo.*, 628 F.2d at 1091. But Frosty Treats's action is based on confusion of sponsorship, and thus the customers' degree of care is of diminished importance. *See King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1090 (10th Cir. 1999). Although Frosty Treats's customers are unlikely to exercise significant care in their purchasing decisions, this

fact alone cannot tilt the balance here regarding the likelihood of confusion. *Cf. Duluth News-Tribune*, 84 F.3d at 1096.

For all of the above-mentioned reasons, we agree with the district court that Frosty Treats failed to present sufficient evidence to create a triable issue as to the likelihood of confusion between the trade dress of Frosty Treats's trucks or its Safety Clown on the one hand and any depictions of trucks or clowns in SCEA's Twisted Metal games on the other.

IV.

Finally, Frosty Treats asserts that it has actionable claims for trademark dilution under both federal and Missouri law. The district court entered summary judgment on Frosty Treats's federal dilution claim because the marks and trade dress at issue are not famous as required by 15 U.S.C. § 1125(c). Frosty Treats argues that niche market fame is sufficient to establish a federal dilution claim, an issue that we have not yet decided. *See Everest Capital Ltd. v. Everest Funds Mgmt., L.L.C.*, 393 F.3d 755, 763 (8th Cir. 2005). But those circuits that do provide protection for marks that have achieved niche market fame generally do so "only when a mark is famous within a niche market and the alleged diluter uses the mark within that niche." *Thane Int'l, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 908 (9th Cir. 2002); *see also Times Mirror Magazines, Inc. v. Las Vegas Sports News, L.L.C.*, 212 F.3d 157, 164 (3d Cir. 2000), *cert. denied*, 531 U.S. 1071 (2001); *cf.* 15 U.S.C. § 1125(c)(1)(E), (F). Accordingly, even if we were to recognize niche fame, Frosty Treats would be unable to make out a claim under 15 U.S.C. § 1125(c).

The Missouri Anti-Dilution Act, *see* Mo. Rev. Stat. § 417.061(1), however, does not require proof of fame. It provides that "[l]ikelihood of injury to business reputation or of dilution of the distinctive quality of a mark ... shall be a ground for injunctive relief." *Id.* Courts applying that statute have required that a plaintiff establish that the mark or trade dress is distinctive and registered under state statute,

*see* Mo. Rev. Stat. §§ 417.005-417.066, or valid at common law, and that the defendant's use of the plaintiff's mark creates a likelihood of dilution of the distinctive quality of the plaintiff's mark. *Cf. Gilbert/Robinson, Inc. v. Carrie Beverage-Missouri, Inc.*, 758 F. Supp. 512, 527 (E.D. Mo. 1991), *aff'd*, 989 F.2d 985 (8th Cir. 1993), *cert. denied*, 510 U.S. 928 (1993). In affirming a district court's rejection of a claim under the Missouri anti-dilution statute we explained, "The gravamen of a dilution complaint is that the [defendant's] continuing use of a mark similar to the plaintiff's mark will inexorably have an adverse effect upon the value of the plaintiff's mark, and that ... the plaintiff's mark will eventually be deprived of all distinctiveness." *WSM, Inc.*, 724 F.2d at 1332 (internal quotation omitted); *see* 3 Louis Altman, *Callman on Unfair Competition, Trademarks and Monopolies* § 22:13 at 22-132 (4th ed. 2004); *see also Gilbert/Robinson, Inc.*, 758 F. Supp. at 527. Plaintiffs' Missouri-law dilution claim fails because the marks and trade dress at issue are so dissimilar that it would be clearly erroneous to hold that there was a likelihood of dilution.

Accordingly, we affirm the judgment of the district court.

_____